1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   EDWARD MAYES,                              No.  2:12-cv-1726 KJM EFB

12            Plaintiff,

13        v.                                    ORDER

14   KAISER FOUNDATION HOSPITALS, et
     al.,
15

16            Defendant.

17

18          This case was on calendar on March 28, 2014 for a hearing on defendants' motion for

19   summary judgment.   Pamela Price appeared for plaintiff Edwards Mayes (plaintiff or Mayes);

20   Seth Neulight appeared for defendants Kaiser Foundation Hospital (Kaiser), Wanetta McGriff

21   (McGriff), Janitress Nathaniel (Nathaniel) and Sherie Ambrose (Ambrose) (collectively

22   defendants).  After considering the parties' arguments, the court GRANTS the motion for

23   summary judgment.

24   I. PROCEDURAL BACKGROUND

25          On May 14, 2012, plaintiff Edward Mayes filed an action in Solano County Superior

26   Court alleging several causes of action stemming from his termination from employment at

27   Kaiser Permanente Hospital in Vallejo.   ECF No. 1 at 7-18.  Defendants removed the action to

28   this court on June 28, 2012.  ECF No. 1.

1    On July 10, 2012, plaintiff filed a demand for a jury trial and on August 7, 2012, filed a

2    first amended complaint.  ECF No. 7.  Thereafter the parties stipulated to plaintiff's filing a

3    second amended complaint (SAC), which was filed on September 21, 2012  ECF Nos. 10-12.

4    Defendants moved to dismiss the SAC on October 19, 2012.  ECF No.  16.  The court granted the

5    motion on January 9, 2013, giving plaintiff leave to file an amended complaint.

6    Plaintiff filed his Third Amended Complaint on January 29, 2013.  It contains five claims:

7    (1) retaliation in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 215(a)(3) against

8    all defendants; (2) race and gender discrimination in violation of California Government Code §

9    12940, *et seq*. against Kaiser; (3) failure to prevent discrimination in violation of California law

10    against Kaiser; (4) race discrimination in violation of 42 U.S.C. § 1981; and (5) race and gender

11    discrimination in violation of 42 U.S.C. § 2000e-2 (Title VII) against Kaiser.  ECF No. 24.

12    II.  STANDARD FOR A SUMMARY JUDGMENT MOTION

13    A court will grant summary judgment "if . . . there is no genuine dispute as to any material

14    fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The

15    "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved

16    only by a finder of fact because they may reasonably be resolved in favor of either party."

17    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[1]

18    The moving party bears the initial burden of showing the district court "that there is an

19    absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S.

20    317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish that there

21    is a genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

22    U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular parts of

23    materials in the record . . .; or show [] that the materials cited do not establish the absence or

24    presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

25    support the fact."  FED. R. CIV. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the

26

27        [1] Rule 56 was amended, effective December 1, 2010.  However,  it is appropriate to rely on cases
decided before the amendment took effect, as "[t]he standard for granting summary judgment remains
28    unchanged."  FED. R. CIV. P. 56, Notes of Advisory Comm. on 2010 amendments.

1   nonmoving party] must do more than simply show that there is some metaphysical doubt as to the

2   material facts").  Moreover, "the requirement is that there be no genuine issue of material fact . . .

3   . Only disputes over facts that might affect the outcome of the suit under the governing law will

4   properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48 (emphasis in

5   original).

6       In deciding a motion for summary judgment, the court draws all inferences and views all

7   evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88;

8   *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).  "Where the record taken as a whole

9   could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue

10  for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*,

11  391 U.S. 253, 289 (1968)).

12      A court may consider evidence as long as it is "admissible at trial." *Fraser v. Goodale*,

13  342 F.3d 1032, 1036 (9th Cir. 2003).  "Admissibility at trial" depends not on the evidence's form,

14  but on its content. *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001) (citing *Celotex*

15  *Corp.*, 477 U.S. at 324).  The party seeking admission of evidence "bears the burden of proof of

16  admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).  If the

17  opposing party objects to the proposed evidence, the party seeking admission must direct the

18  district court to "authenticating documents, deposition testimony bearing on attribution, hearsay

19  exceptions and exemptions, or other evidentiary principles under which the evidence in question

20  could be deemed admissible . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385-86 (9th Cir.

21  2010).  However, courts are sometimes "much more lenient" with the affidavits and documents of

22  the party opposing summary judgment. *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir.

23  1979).

24  III.  EVIDENTIARY OBJECTIONS

25      Defendants have lodged eighty-one objections to the plaintiff's evidence in opposition to

26  summary judgment.  The court will not address any relevance objections:  because it may rely

27  only on relevant evidence in addressing the motion, its citation to evidence subject to a relevance

28  objection means the objection has been overruled.  *Burch v. Regents of Univ. Of Cal.*, 433 F.

3

1   Supp. 2d 1110, 1119 (E.D. Cal. 2006) (stating that relevance objections are redundant because a

2   court cannot rely on irrelevant facts in resolving a summary judgment motion).  Moreover, the

3   court will resolve other objections only to the extent it finds the disputed evidence has any

4   bearing on the issues before it.  *Schwarz v. Lassen Cnty. ex rel. the Lassen Cnty Jail*, No. 2:10-

5   cv-3048 MCE CMK, 2013 WL 5425102, at *13 (E.D. Cal. Sep. 27, 2013) (stating that extensive

6   evidentiary objections undercut the goals of judicial efficiency and avoiding costly litigation).

7   Moreover, "[o]n motions with voluminous objections, 'it is often unnecessary and impractical for

8   a court to methodically scrutinize each objection and give a full analysis of each argument

9   raised.'"  *Olenicoff v. UBS AG*, No. SACV 08-1029 AG (RNBx), 2012 WL 1192911, at *7 (C.D.

10  Cal. Apr. 1, 2012) (quoting *Capitol Records, LLC v. BlueBeat, Inc*., 765 F. Supp. 2d 1198, 1200

11  n.1 (C.D. Cal. 2010)).  "This is especially true where, as here, many of the objections did not

12  actually dispute the essential facts at issue, but instead merely kick up some evidentiary dust."  *Id*.

13  In this case, defendants do not dispute many of plaintiff's facts, though characterizing them as

14  immaterial, but then raise evidentiary objections.  In those instances, when the court finds the fact

15  to be material, the court takes defendants at their word that the fact is undisputed and declines to

16  add to the dust cloud.

17        Finally, as many of the objections are "'boilerplate recitations of evidentiary principles or

18  blanket objections without analysis applied to specific items of evidence,'" the court will not

19  "scrutinize each objection and give it a full analysis."  *Stonefire Grill, Inc. v. FGF Brands, Inc*.,

20  __ F. Supp. 2d __, 2013 WL 6662718, at *4 (C.D. Cal. Aug. 16, 2013) (quoting *Doe v. Starbucks,

21  Inc*., No. 08-0582, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009)).

22        Defendants object to the statement in Mayes' declaration that according to Kaiser's

23  medication policy, delays in administering medication would not be treated as errors if there was

24  no harm to the patient.  Declaration of Edward Mayes, ECF No. 67 ¶ 55.  As Mayes neither

25  attaches the policy to his declaration or otherwise refers the court to the place in the record where

26  the referenced portion of the policy may be found, the court sustains the objection.  *See Carmen

27  v. San Francisco Unified Sch. Dist*., 237 F.3d 1026, 1029 (9th Cir. 2001) (stating the court is not

28  required to comb through record to find a reason to deny summary judgment); *Sch. Dist. No. 1J,*

4

*Multnomah Cnty., Or. v. ACandS,* 5 F.3d 1255, 1261 (9th Cir. 1993) (citing former Rule 56(e) and finding district court did not abuse its discretion in refusing to consider declarations referring to documents not attached); *see also* FED. R. EVID. 1001 ("To prove the content of a writing. . . the original writing . . . is required. . . .").   Attorney Stoller does attach a copy of a medication policy to his declaration; that policy provides in part that "delays in medication administration for scheduled medications without patient harm shall not be considered medication errors. . . ." Declaration of John W. H. Stoller,  Ex. J, ECF No. 73-10at 3 (MAR 2611R, with an effective date of 2/10 and an approval date of 1/13).  The policy has an approval date of January 2013.  *Id.*; *see* Declaration of Seth Neulight, Ex. 19, ECF No. 63-7 (MAR policy 2611, effective 2/10 without language in MAR 2611R attached to Stoller declaration).  Because it is not clear the policy plaintiff references was in force during Mayes' employment, the court will not consider it.

Defendants also object to a series of emails, acknowledging they are authenticated but claiming they are hearsay.  ECF No. 78-1 ¶ 76.  However, as the emails are from Kaiser employees, they are not hearsay.  FED. R. EVID. 801(d)(2)(D).

Defendants object to Exhibit G to Attorney Stoller's declaration.  Although Stoller identifies the document as exhibit 53 to Marta Hudson's deposition, there is no indication she created it.  ECF No. 78-1 at 69.  The objection is sustained.

Defendants object to several portions of the declaration of  Registered Nurse Mary Ransbury, plaintiff's expert, retained to give expert opinions on plaintiff's nursing practices. Declaration of Mary Ransbury, ECF No. 68 ¶¶ 1, 4.  Ransbury opines, among other things, that "[a]s to the claims of Patient VK, that Mr. Mayes did not administer the prescribed medications on March 9, 2011, I determined that the patient's number was scanned into the Kaiser-Vallejo system via the patient's wristband.  It would have been impossible for Mr. Mayes to scan the patient's number from the wristband and not administer a dose of medication."  *Id.* ¶ 13. Defendants object that the statement lacks foundation.    ECF No. 78-1 ¶ 55.  This objection is sustained, as Ransbury does not explain how scanning a wristband translates into certainty that medication was administered.  *United States v. Various Slot Machines*, 658 F.2d 697, 700 (9th Cir. 1981) ("[I]n the context of a motion for summary judgment, an expert must back up his

1    opinion with specific facts."); *Morford v. Wal-Mart Stores*, No. 2:09-cv-02251 RLH-PAL, 2011

2    WL 2313648, at *7 (D. Nev. June 9, 2011) (stating that an expert opinion must be supported by

3    an adequate basis in relevant facts).

4         Plaintiff asks the court to take judicial notice of  Kaiser's settlement of two cases alleging

5    overtime violations.  ECF No. 71.  Although the one of the settlements was reached close in time

6    to the actions involving plaintiff,  there is no showing anyone involved in the instant case was

7    aware of them.  The court declines to take judicial notice of these settlements.

8    IV.  UNDISPUTED FACTS

9         When the parties agree a fact is undisputed, the court refers to their agreement rather than

10   to the portions of the record supporting the agreement.  When the facts are disputed, the court

11   notes the disagreement and cites to the supporting record.  The court does not cite to any facts that

12   are irrelevant to resolution of the pending motion.

13        Kaiser, a health care provider, owns and operates a hospital in Vallejo, California, the

14   locus of this action. TAC ¶ 3.  Kaiser maintains electronic medical records for its patients using

15   "HealthConnect," a computer database.  HealthConnect assigns a unique medical record number

16   (MRN) to each patient and contains the patient's medication administration record (MAR), listing

17   all the patient's prescribed medications and the physician's instructions for the administration of

18   the medications.  Defs.' Reply to Pl.'s Response to Statement of Undisputed Facts, ECF No. 80

19   ¶ 7.[2]  HealthConnect contains an electronic flow sheet, which is an hourly record of patient care.

20   *Id.* ¶ 12.  Nurses are required to enter the patient's height, weight, vital statistics and pain

21   assessments into the flow sheet to create a record of the patient's health during a particular shift.

22   *Id.*

23        Under Kaiser's policy, before administering medication, a nurse is required to document

24   the patient's pain level in the MAR and check for physician's instructions, which must be

---

26   [2]  Defendants' response to plaintiff's statement of undisputed facts is part of ECF No. 80, as is their reply
27   to plaintiff's response to their facts.  The court refers to the latter with a reference to the document and the
     number of the cited paragraph.  To distinguish the two documents, the court cites to defendant's response
28   to plaintiff's statement of facts by ECF number, page number and then paragraph number.

followed.  *Id.* ¶¶ 8, 10, 11.  In addition, anyone administering medication must document in the MAR the medication given, dosage, manner of administration, and time given or the reason the medication was not given.  *Id.* ¶ 9.

Medication is stored in and dispensed from a Pyxis MedStation, which cannot be accessed without  a code.  *Id.* ¶ 13.  When a nurse dispenses medication from the Pyxis, the systems records the name of the employee, the name of the patient for whom the medication is dispensed, the name, dose and quantity of the medication, and the date and time of removal.  *Id.* ¶ 14.  This information is included in a "Pandora report" periodically generated by Kaiser.  *Id.* ¶ 15.

Kaiser required its nurses to follow written policies and procedures on the administration of medication.  *Id.* ¶ 16.  Kaiser Policy No. 2611 requires a nurse to document all medications given or not given and the patient's response in the MAR.  *Id.* ¶ 18.   Kaiser Policy No. 2409 requires a nurse to assess a patient's pain by asking the patient to rate the pain, to conduct pain assessments when a patient is admitted and at least once during each shift, and to document the effectiveness of pain intervention within sixty minutes of administering pain medications.  *Id.* ¶ 21.   Policy 500.10 requires that medications removed from Pyxis but not used must be discarded and treated as pharmaceutical waste, or "wasted," with the waste witnessed by another nurse and documented.  *Id.* ¶ 23.[3]

Kaiser has adopted "MedRite" guidelines which outline a step-by-step process for nurses to administer medications.  *Id.* ¶ 25.  Under these guidelines, a nurse must first review the patient's MAR, then verify the time the patient is to receive the specific drug, verify that the medication he has removed from the Pyxis is the right medication for the right patient in the correct dose and manner of administration (*i.e.* oral or intravenous delivery of the medication) before giving the medication to the patient.  *Id.* ¶ 28.

/////

---

[3]  Plaintiff claims this undisputed fact about the policy requiring the disposal of unused medication is disputed, but cites only to Mayes' own declaration; the page and line cited do not address the medication policy.  Declaration of Edward Mayes,   ECF No. 67 ¶ 42.  Plaintiff does not cite to any other evidence in support of his claimed dispute.

1    Kaiser's policy against violence in the workplace prohibits acts or threats of violence and

2    intimidation, defined as behavior which has the purpose or effect of causing fear.  *Id*. ¶ 30.

3    Although Mayes disputes this, he cites only to a portion of his declaration that does not refer to

4    the policy.   ECF No. 67 ¶ 33.

5    Finally, Kaiser's Principles of Responsibility (POR) required nurses to act with a high

6    degree of professionalism, to involve patients in their own care, to demonstrate a commitment to

7    ethics and integrity, and to be truthful and honest. ECF No. 80 ¶ 31.

8    Edward Mayes, an African American, is a registered nurse who worked for Kaiser from

9    2006 until his discharge on July 1, 2011.  ECF No. 80 ¶ 1.  At the time of his discharge, he

10    worked on the night shift on the 5 East Medical-Surgical Unit at Kaiser's Vallejo hospital.  *Id*.   In

11    2010 and 2011 he reported directly to Assistant Nurse Manager Gina Runas and to Department

12    Managers Wanetta McGriff and, later, Marta Hudson.  McGriff and Hudson reported to Clinical

13    Adult Services Director Janitress Nathaniel.  *Id*.  ¶¶ 4-5.  McGriff and Nathaniel are African

14    American; Hudson and Administrative Services Director Sherie Ambrose are Caucasian, and

15    Runas is Filipina.  *Id*. ¶2 6.  Ginger Bonnar, Human Resources Consultant, provided guidance to

16    Nathaniel on human resources issues regarding Mayes's employment.  Declaration of Janitress

17    Nathaniel,  ECF No. 63-5 ¶ 4.

18    Mayes has not heard any racist remarks from Runas, Bonnar, McGriff, Nathaniel, Hudson

19    or Ambrose and has no reason to believe they are biased against African-Americans.   ECF No.

20    80 ¶ 107.   He also has never heard them make derogatory comments about male nurses.  *Id*.

21    ¶ 110.  Mayes disputes this, relying on his belief he was assigned to care for a particular patient

22    because he was a large male, but this does not suggest discriminatory animus.  Moreover, his

23    belief does not raise a genuine issue of disputed fact.  *See Alpert v. United States*, 481 F.3d 404,

24    409 (6th Cir. 2007) (stating that a statement based on the affiant's belief does not satisfy Rule

25    56(e)'s requirement of personal knowledge); *Friedel v. City of Madison*, 832 F.2d 965, 974 (7th

26    Cir. 1987) (stating that assertions based on belief "cannot serve to raise a genuine dispute on a

27    question of material fact").

28    /////

The patient Mayes was assigned to care for was "FW," a large paraplegic man.  ECF No. 80 at 36 ¶¶ 2, 6.  Mayes complied with physician's orders that FW be given three showers a week, even though it sometimes took Mayes between one and two hours to shower the patient.  *Id*. at 36-37 ¶¶ 1, 8.

On November 5, 2010, McGriff forwarded an email from Administrative House Supervisor Annette Hall to Runas about an allegation by nurse Patty Donahue that Mayes had not given patient "M A-F" pain medication.  *Id*. ¶ 46.  McGriff asked Runas to investigate.  *Id*.

Mayes was a union representative and on November 8, 2010, he and others raised concerns with Kaiser management about alleged timecard alterations resulting in the denial of overtime pay to nurses.  *Id*. ¶ 33.  Neither Nathaniel, McGriff, Ambrose nor Hudson attended this November 8 meeting and did not otherwise learn that Mayes had complained about the alteration of timecards.  *Id*. ¶¶ 39, 41.  Ginger Bonnar, Michelle Camicia, and Gail Sims were present on Kaiser's behalf.  ECF No. 67 ¶ 24.

On November 11, 2010, Mayes and his union representative met with Runas about the complaint Donahue had relayed.  ECF No. 80 ¶ 47.  Ultimately Kaiser's records showed Mayes had given medication to patient M A-F.  *Id*. at 40 ¶ 23.

The next day, Mayes asked to speak privately with Donahue and said she should have looked at the patient's MAR and the Pyxis before reporting to the managers.  *Id*. ¶¶ 48-49.  He did not yell at Donahue or prevent her from leaving the room.  *Id*. at 40 ¶ 25.  Donahue later told Chief Nursing Officer Eleanor Louie Mayes had confronted her.  *Id*. ¶ 50.

On November 16, 2010, during a records review with the pharmacist, Nathaniel noted Mayes had dispensed 3 mg of Dilaudid from the Pyxis apparently without a corresponding physician's order.  *Id*. ¶ 51.  She decided to put Mayes on paid investigatory suspension, *id*. ¶ 52, and so sent an email to Ignacio Ronald Collins, Mayes' union representative, informing him of the suspension, with a copy to Ginger Bonnar.  *Id*. at 42 ¶ 34.

/////

/////

/////

1    The next day, Nathaniel resolved the apparent discrepancy[4] concerning the Dilaudid, but

2    found other instances of Mayes' apparent violation of the medication administration policy; the

3    review showed Mayes dispensed medication from the Pyxis before clocking in at least nine times

4    between October 21 and November 12, 2010.  *Id*. ¶¶ 54-55.  Nathaniel also learned that in

5    September 2010 a patient complained that Mayes had not administered the patient's pain

6    medication, even though he had put something in the IV.  *Id*. ¶ 58.  Runas had investigated but

7    was unable to determine whether the patient had received his medication.  *Id*. ¶ 59.

8    Nathaniel and Ambrose met with Mayes and his union representative on November 18

9    and 22, 2010; McGriff attended the latter meeting.  *Id*. ¶¶ 56-57.   At the latter meeting, they had

10   information Mayes had accessed the Pyxis machine ten times before starting his shift and that

11   nine of those instances were for transactions related to patient FW.  *Id*. at 44 ¶ 42.   Mayes said he

12   sometimes answered FW's need for treatment before he clocked in.   ECF No. 67 ¶ 41.   Also at

13   the latter meeting, Nathaniel, Ambrose and McGriff had information Mayes administered

14   medications within one minute after removing them from the Pyxis, as shown by time differences

15   between withdrawal from the Pyxis and the time of administration as reflected in the Health

16   Connect system.   ECF No. 80 at 44 ¶ 45.

17   While Mayes was on suspension, Donahue told Nathaniel that Mayes had confronted her

18   on November 12 and said several times "Now I know what kind of nurse you are."  *Id*. ¶ 63.

19   Donahue felt harassed or intimidated and was not comfortable working with Mayes.  *Id*.  Mayes

20   disputes these facts, but cites only to his declaration in which he says he told Donahue the patient

21   was a drug seeker and also said only once he "knew what type of nurse she was now."    ECF No.

22   67 ¶ 32.  Whether Mayes repeated the phrase to Donahue or not is not a significant dispute.

23   Nathaniel believed Mayes had intimidated Donahue.  ECF No. 80 ¶ 66.  Nathaniel concluded

24   Mayes had violated the policy on workplace violence.  *Id*. ¶ 67.

---

25   [4]  A Pyxis discrepancy occurs when the medication in the machine does not match the inputs of
26   medication withdrawals, returns or wastes.  ECF No. 67 ¶ 59.  The machine has a touch screen
     and when the proper command is selected the appropriate drawer will open.  *Id*. ¶ 60.  If the
27   medication is returned, the nurse must push the "return" button, which will also open the drawer.
     *Id*.  If the medication is wasted, the nurse must push the "waste" button and place the medication
28   in a designated drawer in the machine or in the sharps disposal box. *Id*. ¶¶ 60-61.

In December 2010, members of Kaiser's management, including Ginger Bonnar, exchanged emails about Mayes' termination. ECF No. 80 at 48 ¶ 61. Also in December Bonnar received a draft of the termination letter for Mayes and was asked to send it to "legal and labor relations." ECF No. 80 at 47 ¶ 56. Bonnar also participated in a conference call discussing Mayes's termination. *Id*. at 48 ¶ 60.

After further investigation, Nathaniel also concluded Mayes had violated Kaiser's policies on medication administration, pain assessment and management, and workplace violence as well as the POR and on January 6, 2011, she placed Mayes on a five-day suspension without pay and gave Mayes a plan of correction. *Id*. ¶¶ 73-75.

On January 7, 2011, Bonnar and Nathaniel met with Mayes, and he and his union entered into a two-year Last Chance/Return to Work Agreement (LCA), which provided that Mayes must comply fully with Kaiser's policies on medication administration, pain assessment and management and the POR and that any failure to do so would result in immediate termination of his employment. *Id*. ¶¶ 74, 77.

On March 9, 2011, Mayes dispensed 10 ml of codeine liquid, a controlled substance, but administered only half to the patient. *Id*. ¶ 78. Although he claimed to have wasted the remainder, he neither documented the waste nor had another nurse witness it. *Id*. ¶ 79. Mayes disputes this, but he says only that the Pyxis dispensed the medication in 10 ml doses only, that he gave the patient the proper dose, that he documented other instances of waste, and that the policy said wasting non-controlled substances did not need to be witnessed. ECF No. 67 ¶ 67. None of this raises a genuine dispute as to this fact. This failure to document the waste violated the medication administration policy. ECF No. 80 ¶ 81.

In March 2011 patient VK complained Mayes had not given him a dose of Dilaudid even though Mayes had recorded having done so in the patient's MAR. *Id*. ¶ 82. Mayes failed to note his pain assessment in VK's flow sheet before and after administering the medication as required by policy. *Id*. ¶¶ 82-83. Marta Hudson interviewed VK about this claim and then called Nathaniel and Bonnar. *Id*. at 51 ¶¶ 79-80.

/////

11

On March 21, 2011, Mayes dispensed and then either returned or wasted two 10 mg tablets of Percocet for patient WM without having first reviewed the patient's physician order, which had changed. *Id.* ¶¶ 84-85.   Hudson, Bonnar, and Nathaniel  interviewed Mayes about the waste discrepancy on March 29, 2011 and Nathaniel directed Mayes to resolve the discrepancy.

In twenty-two separate instances between April 1, 2011 and May 14, 2011, Mayes dispensed both oral and intravenous narcotics for the same patient within minutes and recorded giving both doses to the patient; in each of those cases, the physician's order specified delivery of narcotics either orally or intravenously; in none of those cases did Mayes confirm with the doctor that he could employ two methods of administering narcotics.  *Id.* ¶¶ 87-89.  Mayes did not have discretion under his nursing license to deviate from physician orders when dispensing medication. *Id.* ¶ 90.

Hudson identified twenty-nine other nurses who administered both oral and intravenous narcotics for the same patient within an hour and recommended they be asked about their rationale for administering oral and IV medications within sixty minutes of each other;  Hudson could not recall whether  these nurses were disciplined.  ECF No. 80 at 56 ¶¶ 101-102;  *see* Declaration of John Stoller, Ex. H, ECF No. 73-8 at 1-2; Ex. D, Deposition of Marta Hudson, ECF No. 73-4 at 17: 7-14.  Hudson's report identifies these nurses by name but not by race.  *Id.*

On May 18, 2011, Kaiser put Mayes on paid investigatory leave.  *Id.* ¶ 86.  In a memorandum dated July 1, 2011, Kaiser advised Mayes his employment was being terminated because of his continued failure to comply with policies and the terms of the LCA.  *Id.* ¶ 94.

Mayes filed a grievance and ultimately pursued arbitration.  ECF No. 80 ¶¶ 95-98.  The arbitrator denied the grievance, finding Mayes had violated the terms of the LCA by failing to abide by Kaiser's policies on medication administration, pain assessment and patient's rights.  *Id.* ¶ 104.

## V.  FLSA RETALIATION

Under 29 U.S.C. § 215(a)(3), it is unlawful for an employer "to discharge or in any manner discriminate against any employee because such employee has filed any complaint or

1  instituted or caused to be instituted any proceeding under this chapter . . . ."  This provision

2  protects employees "who complain about violations to their employers . . . ." *Lambert v.*

3  *Ackerley*, 180 F.3d 997, 1004 (9th Cir. 1999) (en banc).  "[S]o long as an employee

4  communicates the *substance* of his allegations to his employer (e.g., that the employer has failed

5  to pay adequate overtime . . .) he is protected by § 215(a)(3)."  *Id.* at 1008 (emphasis in original).

6       There are two ways a plaintiff may show FLSA retaliation.  In a mixed motive case, when

7  the plaintiff has produced evidence the adverse action is based on both protected and unprotected

8  activities, he must show the protected activities were a substantial factor in the employer's actions

9  by demonstrating "the adverse actions would not have been taken 'but for' the protected

10  activities."  *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 (9th Cir. 1996).  In a dual or

11  mixed motive cases, "it is the defendant's affirmative burden to prove that it would have taken the

12  adverse action if the proper reason alone existed."  *Id.*; *see also Contreras v. Corinthian Vigor*

13  *Ins. Brokerage, Inc.*, 103 F. Supp. 2d 1180, 1185 (N.D. Cal. 2000).

14       When a plaintiff relies on circumstantial evidence to show that the employer's adverse

15  employment action was retaliatory, the court analyzes the case under the burden-shifting scheme

16  of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804 (1973).   Under *McDonnell*

17  *Douglas*, a plaintiff establishes a prima facie case by showing he engaged in an activity protected

18  by the FLSA, he suffered an adverse employment action subsequent to the protected activity, and

19  a causal connection between the protected activity and the employment action.  *Contreras*, 103 F.

20  Supp. 2d at 1184; *see McBurnie v. City of Prescott*, 511 F. App'x. 624 at n. 2 (9th Cir. 2013)

21  (unpublished) (suggesting but-for causation is applicable not only to dual motive retaliation

22  claims).  If plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a

23  legitimate reason for  its action.  *Contreras*, 103 F. Supp. 2d at 1184; *Schemkes v. Jabob Transp.*

24  *Servs., LLC*, No. 2:12-CV-1158 JCM CWH, 2014 WL 825947, at *4 (D. Nev. Mar. 3, 2014).   If

25  the employer does so, the burden shifts back to plaintiff to produce evidence that the employer's

26  reasons are pretextual.  *Id.*

27       Defendants do not challenge plaintiff's claim that his participation as a union

28  representative in the November 8, 2010 meeting about overtime constitutes protected activity

13

1    under the FLSA.  They also acknowledge that temporal proximity between the protected

2    activity—the November 8 meeting—and an adverse employment action—the beginning of the

3    investigation of Donahue's claims about Mayes and patient M A-F on November 10—may give

4    rise to an inference of a causal link.  *See Schemkes*, 2014 WL 825947, at *4 ("The fact that

5    plaintiff's termination occurred less than two weeks after he initiated his FLSA action creates an

6    inference of a causal relationship between plaintiff's initial FLSA claim and his termination");

7    *see also Raad v. Fairbanks N. Star Borough Sch. Dist*., 323 F.3d 1185, 1197 (9th Cir. 2003),

8    *amended on denial of reh'g*, No. 00-35999, 2003 WL 21027351 (9th Cir. May 8, 2003) (stating

9    that temporal proximity between protected activity and adverse action may give rise to inference

10   of retaliation).

11          Defendants argue, however, that none of those involved in the investigation that lead to

12   plaintiff's suspension and ultimately to his termination were aware of his participation in the

13   November 8 meeting and that Ginger Bonnar, the Human Resources consultant who attended

14   meeting, did not participate in the investigation or make any decision to discipline or terminate

15   plaintiff but rather only reviewed notes from the investigatory meetings.   They point to Bonnar's

16   testimony that she was not involved in the investigation and did not play any decision-making

17   role in the events and also Janitress Nathaniel's statement that Bonnar provided only "guidance

18   from time to time on human resources issues pertaining to Mr. Mayes' employment" but "did not

19   initiate or make" any of the decisions relating to the investigation and ultimate termination of

20   plaintiff.  Declaration of Seth Neulight, Ex. 2, ECF No. 63-6 at 149: 7-9;  Nathaniel Decl., ECF

21   No. 63-5 ¶ 4.

22          Plaintiff argues that Bonnar provided HR advice to each of the managers involved in his

23   termination and said each of these managers were Bonnar's "clients."  ECF No. 70.  He cites to

24   Bonnar's deposition testimony, attached as exhibit B to Attorney Stoller's declaration.  However,

25   the portion he cites is not included in that exhibit.  He also disputes the fact of Bonnar's limited

26   involvement by relying on his own declaration that on January 7, 2011, Bonnar and Nathaniel

27   gave him a memorandum concerning a five-day suspension without pay for violating the

28   /////

1     medication administration, pain assessment and management, and violence in the workplace

2     policies as well as the principles of responsibility.  Mayes Decl., ECF No. 67 ¶ 50.

3           In *Staub v. Proctor Hospital*, the Supreme Court said that if a supervisor undertakes an act

4     motivated by a discriminatory bias that is intended to cause and does proximately cause an

5     adverse employment action, then the employer is liable under the cat's paw theory of liability.

6     131 S.Ct. 1186, 1194 (2011); *see also Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007)

7     (stating that a subordinate's bias can be imputed to an independent decision maker who acts

8     against plaintiff based on the influence of or involvement by the biased subordinate).   In this

9     case, to establish cat's paw liability, plaintiff would have to show that in response to plaintiff's

10     protected activity, Bonnar set in motion the investigation and ultimate termination and that she

11     influenced or was involved in the decision-making process. *Cafasso, U.S. ex rel v. Gen.*

12     *Dynamics C4 Sys., Inc*., 637 F.3d 1047, 1061 (9th Cir. 2011).   Although his burden of

13     establishing the prima facie case is not onerous, *Snead v. Metro. Prop. & Cas. Ins. Co*., 237 F.3d

14     1080, 1091 (9th Cir. 2001),  he has not raised any dispute over the question whether Bonnar set

15     the investigation in motion, whatever her involvement in the later stages of the decision-making.

16     *Cafasso*, 637 F.3d at 1061.

17           However, even if the court assumes the evidence of Bonnar's participation in the later

18     stages of the proceedings satisfies plaintiff's prima facie case, Kaiser has proffered legitimate

19     non-retaliatory reasons for the initial suspension and ultimate termination:  it asserts it initially

20     took action because plaintiff violated several of Kaiser's policies, including the policy against

21     violence in the workplace and the policy regarding medication administration, and ultimately

22     terminated plaintiff for his failure to abide by policies regarding medication administration and

23     pain assessment as required by the LCA.  This is sufficient. *See Bodett v. CoxCom, Inc*., 366 F.3d

24     736, 744-45 (9th Cir. 2004) (stating that a facial violation of the company's harassment policy

25     satisfied the company's burden); *Kodwavi v. Intercontinental Hotels Grp. Res., Inc*., __ F. Supp.

26     2d __, 2013 WL 4737328, at *10 (N.D. Cal. Sep. 3, 2013) (stating employer satisfied burden by

27     providing evidence that employee was discharged for violating company policy by assaulting and

28     threatening an employee); *Nicholson v. West Penn Allegheny Health Sys*., Civil Action No. 06-

0814, 2007 WL 3120275 (W.D. Pa. Oct. 23, 2007), *aff'd*, 297 F. App'x 157 (Oct. 21, 2008) (unpublished) (employer satisfied its burden by presenting evidence it terminated plaintiff for violating terms of the last chance agreement).

Plaintiff suggests these are not legitimate reasons because the Pyxis policy does not mention discipline for improper wasting of medications and the investigation was flawed because he was never interviewed about Donahue's claim nor was patient FW interviewed about plaintiff's medication practice.  ECF No. 70 at 14-15.  Nathaniel says she undertook an investigatory meeting with Mayes about the workplace violence issue before suspending him. Declaration of Seth Neulight, Ex. 3, Deposition of Jaintress Nathaniel, ECF No. 63-6 at 169:1-7. Mayes contends he was not interviewed about the incident with Donahue.  ECF No. 67 ¶ 34. This dispute is not material, however, as it does not suggest the reason for the discharge was not legitimate.  Moreover, the fact that the arbitrator found plaintiff's discharge to be proper "'is highly probative of the absence of discriminatory intent in that termination.'"  *Smith v. United Parcel Serv.*, No. C 03-04646 CRB, 2006 WL 733467, at *3 (N.D. Cal. Mar. 22, 2006) (quoting *Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002)).  Defendants have borne their burden of proffering a legitimate, non-retaliatory reason for the suspension and dismissal.

The burden now returns to plaintiff to show the articulated reason is a pretext directly "'by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  *Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1062 (9th Cir. 2002) (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123 (9th Cir. 2000)).  Plaintiff must show more than that the employer's justification is false because "courts only require that an employer honestly believed its reason for action, even if its reason is foolish or trivial or even baseless."  *Villiarimo*, 281 F.3d at 1063 (internal citation and quotation marks omitted).  The employee must meet the employer's evidence  with "'specific, substantial evidence of pretext.'" *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994) (quoting *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)).
/////

1    The evidence as to pretext, whether direct or indirect, must be considered cumulatively.  *Chuang*,

2    225 F.3d at 1129.

3         Direct evidence includes discriminatory or retaliatory statements or actions by the

4    employer.  *Munoz v. Mabus*, 630 F.3d 856, 865 (9th Cir. 2010); *Godwin v. Hunt Wesson, Inc*.,

5    150 F.3d 1217, 1221 (9th Cir. 1998) ("'Direct evidence is evidence, which if believed, proves the

6    fact of [discriminatory animus] without inference or presumption.'") (quoting *Davis v. Chevron,*

7    *U.S.A., Inc*., 14 F.3d 1082, 1085 (5th Cir. 1994)) (alteration in original).  Plaintiff has provided no

8    direct evidence that retaliatory animus motivated the decision.  Even if the court were to take

9    judicial notice of Kaiser's two settlements of overtime lawsuits, this would not provide direct

10   evidence of animus because plaintiff has presented nothing suggesting any of the decision-makers

11   in this case were aware of them.

12        Deviations from protocol and procedural irregularities may give rise to an inference of

13   pretext.  *Porter v. Cal. Dep't of Corr*., 419 F.3d 885, 896 (9th Cir. 2005).  Plaintiff argues the

14   policy regarding violence in the workplace requires a "Threat Management Plan," and a follow up

15   plan but none was utilized in connection with Donahue's complaint about plaintiff's behavior.

16   ECF No. 70 at 14.  The policy does require a threat management plan, but the plan as defined is a

17   general approach to preventing violence in the workplace, not a response to a specific act that an

18   employee experiences as intimidating.  *See* Declaration of Seth Neulight, Ex. 17, ECF No. 63-7 at

19   114.  Plaintiff argues he was not interviewed about the incident and, as noted, there is a dispute in

20   the evidence on this point.  The policy does call for "prompt, thorough, <u>factual</u> and coordinated

21   investigation of all reports," *id*., at 115 (emphasis in original), but nothing in the policy mandates

22   an interview with the alleged perpetrator.   This evidence is not specific, substantial evidence of

23   pretext.

24        Similarly, plaintiff asserts Nathaniel did not speak to FW about plaintiff's practices even

25   though plaintiff explained he accessed the Pyxis before clocking in in order to address FW's

26   needs.  ECF No. 70 at 15.  He has not shown, however, that an investigation into a nurse's Pyxis

27   practices would include interviews with patients.

28   /////

17

1    Plaintiff asserts that utilizing both oral and intravenous narcotics was a common practice

2    on the unit as a way of treating break-through pain.  ECF No. 67 ¶ 69.  His expert witness, Mary

3    Ransbury, also avers that using both an oral tablet of pain medication and an intravenous dose

4    close in time is a common practice for break-through pain.  Declaration of Mary Ransbury, ECF

5    No. 68 ¶ 7.  Ransbury reviewed an Activity Report generated from the Pyxis on the 5-East

6    Medical-Surgical Unit and noted that "multiple users . . . practiced administering medication in a

7    similar method as Mr. Mayes."  *Id*. ¶ 10.  She also found at least one instance where a nurse had

8    administered only a portion of a prescribed medication and several instances of patients receiving

9    medication without proper documentation.  *Id*. ¶ 11.

10    Although Ransbury's declaration provides some heft to plaintiff's showing, it ultimately is

11    not enough.  Ransbury asserts that other nurses administered both oral and intravenous pain

12    medication to the same patient within a short period of time, but nothing in her declaration shows

13    this administration conflicted with physician orders.  Moreover, even if these instances were

14    violations, there is no evidence in the record addressing whether these nurses were disciplined.

15    Indeed, that Hudson reviewed the medication records and assembled a list of nurses whose

16    practices were to be investigation suggests that defendants' investigation of Mayes was not a

17    pretext.

18    Viewed cumulatively, plaintiff has not presented sufficient evidence of pretext to defeat

19    summary judgment.

20    VI.   FEHA AND TITLE VII DISCRIMINATION CLAIMS AND SECTION 1981 CLAIMS

21    Plaintiff alleges the evidence shows he was treated differently from his non African-

22    American female co-workers who ignored the doctor's orders for giving showers to FW and yet

23    were not disciplined.  He also argues Caucasian employees who violated the Workplace Violence

24    policy were not held accountable and disciplined as he was.

25    Under Title VII of the Civil Rights Act (Title VII), 42 U.S.C. § 2000e-2(a)(1), it is

26    unlawful for an employer "to discharge any individual . . . because of such individual's race,

27    color, religion, sex, or national origin. . . ."  Under the FEHA, it is illegal for an employer to

28    discriminate against an employee "in compensation or in terms, conditions, or privileges of

1   employment" on the basis of race, color, or national origin.  CAL. GOV'T CODE § 12940(a).  Also

2   under the FEHA, it is unlawful for an employer "to fail to take all reasonable steps necessary to

3   prevent discrimination and harassment from occurring."  CAL. GOV'T CODE § 12940(k).

4          42 U.S.C. § 1981 states in relevant part that "[a]ll persons within the jurisdiction of the

5   United States shall have the same right . . . to equal benefit of all laws . . . as is enjoyed by white

6   citizens. . . ."  To establish such a claim, a plaintiff must show he is the member of a racial

7   minority, the defendant intended to discriminate, and the discrimination concerned one or more of

8   the activities listed in the statute (e.g., make and enforce contracts, sue and be sued, give

9   evidence).  *Dutra v. BFA Waste Sys. of N. Am., Inc*., No. 12–cv–03338 NC, 2013 WL 2950662, at

10  *3 (N.D. Cal. June 14, 2013).

11         The *McDonnell Douglas* framework generally applies to plaintiff's FEHA and Title VII

12  claims.  *Metoyer v. Chassman*, 504 F.3d 919, 941 (9th Cir. 2007); *see also Wills v. Superior*

13  *Court*, 195 Cal. App. 4th 143, 159 (2011) (quoting *Guz v. Bechtel Nat'l, Inc*., 24 Cal. 4th 317,

14  354 (2000)); *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1108-09 (2007).  There

15  is, however, a difference in a FEHA claim:  when a defendant-employer moves for summary

16  judgment in a FEHA case, the burden is reversed.  *Dep't of Fair Emp't & Hous. v. Lucent Techs.,*

17  *Inc.*, 642 F.3d 728, 745 (9th Cir. 2011); *see also Kelly v. Stamps.com Inc.*, 135 Cal. App. 4th

18  1088, 1097–98 (2005) (citing *Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 850–51 (2001)).

19  Thus, the moving defendant bears the initial burden to "show either that (1) plaintiff [can] not

20  establish one of the elements of the FEHA claim or (2) there [is] a legitimate, nondiscriminatory

21  reason" for its actions.  *Lucent*, 642 F.3d at 745.

22         Plaintiff alleges female nurses were not disciplined for failing to give FW showers, but his

23  only support is his belief that none of the females, who were worried about bacteria from FW's

24  open ulcers, provided showers when he was absent.  At the hearing, counsel also argued that

25  plaintiff was the only nurse to care for FW but again there is no proof of this in the record.

26  Plaintiff's belief is insufficient proof of discriminatory treatment.

27  /////

28  /////

1    He also offered the declaration of union representative Roland Collins, who says he has

2    represented people accused of violations of the workplace violence policy.  Declaration of Roland

3    Collins, ECF No. 69 ¶ 19.  He says, for example, that Timothy Squire, a Caucasian male, punched

4    someone but yet was not required to sign an LCA; and Peter Ribarik, a Caucasian/Japanese nurse

5    shouted at a female nurse but was not disciplined at all.  Both of these employees worked on 5-

6    East and were in the same supervisory chain as plaintiff.  *Id.*  Similarly, Carthon Johnson, an

7    African-American male nurse, assigned to the 4th floor tele-med unit, was required to take anger-

8    management classes as the result of a claim he had assertively raised concerns about his shift

9    assignments.  *Id.*  ¶ 20.

10    None of this establishes a prima facie case of race plus gender discrimination or rebuts

11    Kaiser's showing of a legitimate reason for the discharge, described above, as plaintiff has not

12    shown the employees allegedly receiving more favorable treatment "are similarly situated . . . in

13    all material respects."  *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006).  Others are "'similarly

14    situated' when they have similar jobs and display similar conduct."  *Vasquez v. Cnty. of Los

15    Angeles*, 349 F.3d 634, 641 (9th Cir. 2003)  (finding comparators not similarly situated when they

16    "did not engage in problematic conduct of comparable seriousness").  "Courts 'require that the

17    quantity and quality of the comparator's misconduct be nearly identical to prevent courts from

18    second-guessing employers' reasonable decisions and confusing apples with oranges.'"  *Day v.

19    Sears Holding Corp*., 930 F. Supp. 2d 1146, 1163 (C.D. Cal. 2013) (quoting *Manicca v. Brown*,

20    171 F.3d 1364, 1368 (11th Cir. 1999)).

21    Here, plaintiff has not pointed to evidence that Caucasians who were not disciplined for

22    alleged workplace violence were alleged to have violated other policies.  Nevertheless, there is

23    evidence in the record that Ribarik and Squire were investigated for administering narcotics both

24    orally and intravenously within a sixty minute period.  ECF No. 73-8 at 1-2.  This evidence

25    ultimately does not show plaintiff could establish a prima facie case of discrimination.  Although

26    Mayes, Squire and Ribarik all were alleged to have violated both the violence in the workplace

27    policy and the medication policy, there is no indication how many times Squire and Ribarik

28    administered medications both orally and intravenously, whereas there is evidence that Mayes

administered medications by both delivery processes twenty-one times after he had signed his LCA agreeing not to do so.  ECF No. 80 ¶¶ 87-89.  These comparators are not sufficiently similar to support plaintiff's claim of discrimination.  And when there is no viable claim of discrimination, there is no claim for failure to prevent discrimination.  *Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.*, 103 Cal. App. 4th 1021, 1035 (2002); *Ruiz v. Sysco Corp.*, No. 09–CV–1824–H (MDD), 2011 WL 3300098, at *6 (S.D.Cal. July 29, 2011).  Moreover, as he has not established discrimination, he has not shown he will succeed on his § 1981 claim.

IT IS THEREFORE ORDERED that:

1. Defendants' motion for summary judgment, ECF No. 63, is granted; and

2. This case is closed.

DATED:  June 2, 2014.

_____
UNITED STATES DISTRICT JUDGE